## Whelen *versus* Boyd.

1. When a certificate from the superintendent of a building certifying that the work has been well and properly completed, according to contract, which is made a prerequisite to the payment for said work, is withheld by the superintendent, not because the work has not been well and properly completed according to contract, but by order of the owner of the building, the employer of the superintendent, the builder may recover without the certificate of the superintendent.

2. Where the parties to a contract for the faithful performance of which a bond of indemnity has been given, materially change the contract without the knowledge or consent of the bondsmen, they are thereby released from their obligation under the bond.

January 7th, 1886.   Before MERCUR, C. J., GORDON, PAXSON, STERRETT, GREEN and CLARK, JJ.

ERROR to the Court of Common Pleas No. 49, *Philadelphia county:* Of January Term 1885, No. 59.

Assumpsit by Alexander Boyd, against Edward P. Whelen to recover $1,000 and interest on the same, being the balance which he alleged was due him for plastering twelve houses. Pleas non assumpsit, payment, set-off with leave.

The following are the facts as they appeared on the trial before ELCOCK J.

On the thirteenth day of March, 1878, Edward S. Whelen, who was the owner of a lot of ground in the city of Philadelphia, entered into written articles of agreement with John B. Martel for the sale of the same to him, and for making to him certain advances.

By these articles Whelen agreed to sell the ground for $24,700. He further agreed that he would advance Martel to aid in the erection of a building on each of the twelve lots $1600, or $19,200 in all, in six equal installments as the work progressed, "upon the receipt of a certificate from the agent or superintendent, to be appointed by said Whelen, that the work, upon the completion of which the said advances are to be paid respectively, has been well and properly completed, according to contract," etc.   The last installment was to be due only after the buildings were completely finished and the pavements were laid.

By said articles Martel agreed to buy for said price ; to erect continuously, and without delay or interruption, on the twelve lots, twelve buildings according to certain plans which had been prepared, and to complete the same before the first day of October, 1878; and to execute twelve bonds secured by twelve mortgages, one on each of said lots, aggregating $43,900, to secure the purchase and advance moneys.

Martel, finding himself unable to complete his contract, assigned the same to one A. Merritt Asay, Jr.   Before Whelen would assent to such assignment, he required that security should be furnished by Asay for the completion of the buildings provided by the contract.   A joint and several bond in the penal sum of $10,000, dated 6th of August, 1878, was therefore executed by several parties, including Alexander Boyd, the plaintiff, which was delivered to Whelen, conditioned "that if the above-named obligors, their heirs, executors, administrators or assigns, or any of them, shall and will well and truly finish, or cause to be finished, the buildings which the said A. Merritt Asay, Jr., by virtue of his position as assignee of the above-recited agreement, agrees to erect upon the lot of ground in accordance with the terms and specifications of said agreement, and shall and will indemnify, save harmless and protect the said obligee of and from all loss, damages, costs, charges and expenses whatsoever in the finishing and completion of said houses, and shall and will indemnify, save harmless and protect the said obligees of and from any and all liens which may be filed against said building by any contractor or person who should or might file a lien or liens, then this obligation to be void or else to be and remain in full force and virtue."

On the twenty-third day of April, 1879, Whelen sent to each of the signers of said bond, including Boyd, a notice calling attention to the obligation to complete said houses. He added: "Every day's delay interferes with the chance of sale in the spring, and from what is stated to be the present need to complete them, the full amount of the bond will be necessary."

No attention to this notice was given, and Whelen was obliged to make further advances to the extent, as he asserts, of $15,000 beyond those agreed upon in the contract with Martel, in order to secure the completion of the buildings.   On April 8th, 1879, before this notice, an entirely new arrangement and agreement, materially changing the original contract between Whelen and Asay, was drawn up and executed by them.   Under this new arrangement, Whelen took as security for these new advances a conveyance by Asay to his son of the houses themselves, under an agreement that they should be repaid as fully as possible out of the proceeds of their sale.   It was impossible, however, to sell them.

On the 20th of April, 1882, Whelen addressed to each of said bondsmen, including Boyd, a letter in which he reminded them of what was well known to them—Asay's failure and their own to complete said contract.   He notified them that in consequence thereof he had been obliged to expend $15,000

[Whelen *v.* Boyd.]

in excess of the agreed-upon advances to secure the completion of the buildings, and that he had taken a pledge of the houses themselves as his security.   He added: "I am about to sell his interest therein, but before doing so make you the offer to assign all my claim on him and them to you on payment of the $10,000 of indemnity secured to me by your bond aforesaid.   Should you decline, I will sell the houses and look to you for the difference.   I will be glad at any time to satisfy you that my extra outlay to finish the houses, owing to Asay's and your default, was much more than $10,000."

No attention was paid to this letter.   The properties were exposed at public auction, and no bids could be obtained. Title to the same at the time of the trial still remained in Whelen's son.

Asay had entered into a contract with the plaintiff, who was a plasterer, for the plastering of said houses, for which he was to be paid in a mortgage held by Whelen for $3,600, of one of the houses, which the latter had agreed with Asay to pay to him on the performance by him of his contract.   Boyd entered into the contract with Whelen and sold him this mortgage. The whole contract is in writing, and was as follows:—

"Philadelphia, October 18th, 1878.   Whereas I have contracted with Alexander Boyd for the plastering of twelve houses, on the south side of Butler street, east of Broad street, and have agreed to give him in payment thereof a certain mortgage for thirty-six hundred dollars on one of the said houses, to be received from Mr. Edward S. Whelen under my contract to complete said houses, in place of John B. Martel:

"Now this agreement witnesseth, That I do hereby release said Edward S. Whelen from any obligations under my said contract to deliver to me the said mortgage for thirty-six hundred dollars; and that I have assigned, and hereby assign, transfer and set over to the said Alexander Boyd all my right, title, interest, claim and demand for said mortgage to the said Alexander Boyd, for his sole use and in payment for said plastering, and to his assigns, so soon as I shall be entitled to receive and demand the same under my contract to complete the twelve houses on Butler street; and I do hereby acknowledge this as my receipt in full to said Edward S. Whelen for all claims and demands upon him for the sum of thirty-six hundred dollars under my contract with him, in consideration of his paying to said Alexander Boyd such sum as may become due for plastering as the work is performed and completed, from time to time, not exceeing in all the sum of three thousand dollars in cash payment, at which price the said Alexander Boyd has sold the said mortgage. "A. MERRITT ASAY, JR." [SEAL.]

[Whelen *v.* Boyd.]

" Philadelphia, October 18th, 1878.   For value received, and the sum of five dollars to me in hand paid, the receipt of which I do hereby acknowledge, I do hereby assign, transfer and set over unto Mrs. Isabella N. Whelen all my right, title and interest in the mortgage of thirty-six hundred dollars which A. M. Asay has assigned to me in payment for account for plastering twelve houses on south side of Butler street, east of Broad street, on condition that in all the sum of three thousand dollars shall be paid over to me as I shall be entitled to it under the contract of A. M. Asay with Edward S. Whelen for the completion of said houses, so fast as said A. M. Asay shall be entitled to any payment, I having sold my claim to said mortgage for the sum of three thousand dollars, which is more valuable to me than the said mortgage, when earned under Asay's contract with Edward S. Whelen.

" Signed in presence of
SAM'L T. ZELLEY,      ·⎫ " ALEXANDER BOYD." [SEAL.]
A. MERRITT ASAY, Jr. ⎰

Under the pressure of Boyd's necessities, urged upon Whelen, the latter paid him $2,000 on account, leaving $1000 unpaid at the time suit was brought.

Boyd, as Whelen alleged, did not finish the work properly. The latter refused to pay him, for three reasons :—

1. His failure to furnish any certificate by Bye (who was the superintendent appointed in accordance with the provisions of the contract of 13th March, 1878) that the work was completed.

2. Asay's failure to finish his work, which deprived him of any right to receive, and of all power to pay over to Boyd, the $3,600 mortgage.

3. Boyd's indebtedness upon said $10,000 bond given to secure the completion of Asay's said contract.   This indebtedness was set off, and a certificate was asked for.

No certificate of completion was ever signed by Bye; but Boyd introduced evidence of a conversation with Bye in which it was shown, that the latter admitted the completion of Boyd's work, but refused to give Boyd the certificate, because he had been. ordered not to do so by Whelen.   (First assignment of error.)

Verdict for plaintiff in the sum of $1,288.88, and judgment thereon ; whereupon the defendant took this writ, assigning for error the admission of the evidence as above shown, and the refusal of the court to instruct the jury that any of Whelen's defences as above set out were sufficient to prevent a recovery.

. *John S. Johnson* and *W. Heyward Drayton,* for plaintiff in

error.—The superintendent's certificate that the work was well and properly done according to contract, is. a pre-requisite to recovery: Reynolds *v.* Caldwell, 51 Pa. St., 298; Howard *v.* Allegheny Val. R. R., 69 Pa. St., 489.

The liability of the ˙plaintiff on his bond of indemnity to Whelen for the failure of Asay to complete the buildings, was a proper set-off. There should have been a certificate in favor of the defendant: Kernochan *v.* Ins. Co., 17 N. Y., 428; Gooding *v.* Shea, 103 Mass., 360; Byron *v* Chapin, 113 Mass., 311; · Curtis *v.* Baugh, 79 Ill., 242; Johnson *v.* Britton, 23 Ind., 105; Lathrop *v.* Atwood, 21 Conn., 117; Bank *v.* Moors, 134 Mass., 135; Kidd *v.* McCormick, 83 N. Y., 391.

*Lewis Stover* for defendant in error.—Whelen prohibited the superintendent from paying the certificate. He cannot take advantage of his own fraud: Reynolds *v.* Caldwell, 51 Pa. St., 307.

The agreement subsequent to the bond so materially changed the contract between the parties as to release the bondsmen from their liability under the bond, as the new agreement was made without their knowledge or consent: In re North American Land Co., 60 Pa. St., 260; Kellog *v.* Stockton, 29 Pa. St., 463; Everly *v.* Rice, 20 Pa. St., 299; Clow *v.* Coal Co., 28 Pa. St., 439.

Mr. Justice GREEN delivered the opinion of the Court, October 4th, 1886.

The jury have found by their verdict that Boyd did the plastering sufficiently well to earn his money. It is true that Bye declined to give him a certificate of approval, but what of that? It is by no means clear that a certificate of approval was an indispensable pre-requisite before Boyd could claim payment, but if it were, there was testimony enough to justify the inference that it was not given, not because Bye did not think it was deserved, but because Whelen, under whose orders he was acting, would not permit him to give it; and if so, the law is settled that he can not take advantage of his own or his agent's wrong. We see nothing then in this point which would warrant us in disturbing the judgment.

Nor is there anything in the contention that under the papers of October, 18th, 1878, Boyd was to be paid $3,000 only in case Asay did what was necessary to entitle him to receive the $3,600 mortgage. It is true that in the first of these two papers Asay recites that he has assigned to Boyd his right to said mortgage, " so soon as I shall be entitled to receive and demand the same under my contract to complete the twelve houses, &c. He could assign nothing else so far as

this mortgage was concerned, for he had nothing else to assign —but when we come to the consideration for which, by this same paper, he releases Whelen from his obligation to deliver to him this mortgage, we find that it was, "of his paying to said Alexander Boyd such sum as may become due for plastering *as the work is performed and completed* from time to time, not exceeding in all the sum of $3,000 in each payment, at which price the said Alexander Boyd has sold the said mortgage." That is, Boyd is to be paid cash from time to time, not to exceed $3000 in all, as his work—plastering—not Asay's work, the building of the houses, is performed and completed. And the second of these papers, by which Boyd assigned to Whelen's wife what Asay had assigned to him, explains why he had sold for $3,000 in cash his right to the $3,600 mortgage, viz., "I having sold my claim to said mortgage, for the sum of $3,000, *which is more valuable to me than the said mortgage when earned under Asay's contract with Edward S. Wheeler."* If, as contended by the plaintiff in error, Boyd would be entitled to be paid only when the mortgage should be " earned under Asay's contract, then the plain language of these papers must be ignored, and we are at a loss to know for what Boyd paid or abated $600 in the price of his work; unless, which seems incredible, he was paying or abating this sum for the privilege of retaining the risk which the papers show he intended to avoid. These papers were drafted by Whelen, and are to be read together as explanatory and expressive of the arrangement between him and Asay and Boyd; and so read, we cannot doubt that it was understood that Boyd undertook to do the plastering in consideration that he should be paid as and when his own work was done, independently of the fact whether the work contracted to be done by Asay was done well, or in time, or at all.

But conceding this, it is further contended that there is a set-off, in the shape of a bond (whether of indemnity or guaranty) in which Boyd is one of the obligors, which had become payable by reason of Asay's default under his building contract with Whelen. But, according to the evidence Asay had made actual or essential default, and while Boyd was going on with the plastering, Asay finding or fearing that he would be "unable to fulfill his contract," made another agreement, . April 8th, 1879, with Whelen, as to the finishing of the said houses, differing materially from the original contract, and in pursuance of which Asay conveyed the said lots and houses to Whelen's son as security for Whelen. This was done, as far as appears, without the knowledge or consent of the obligors in the bond. It is true that Whelen notified them of Asay's inability to fulfill his contract, and called their attention to

their obligation to complete the said houses, but this was not until April 23d, 1879, fifteen days after Whelen had made his new contract with Asay, had taken conveyance of the property to his own son as security, had in effect, if not in very terms, released Asay from the original contract, and when, therefore, the obligors had become released from the obligation of their bond. Why, if Whelen intended to look to the bond, he thus made this new contract it is not easy to understand. It was not merely taking additional security, it was making a new contract with substituted security. When Asay made default, if he did make actual default, Whelen's remedy on the bond was complete, and the cases cited by the plaintiff in error would apply. If the obligors had omitted or refused to fulfil their covenant he could have brought suit against them and recovered damages to the extent of the injury suffered or loss sustained. But he did not. Before, so far as appears, there was any operative default upon the part of Asay, or any knowledge by the obligors of his immediate or prospective inability to go on, Whelen, without their consent, without calling upon them or affording them an opportunity to fulfil their covenant, entered into a new contract with Asay which not only prevented them from doing so, but would have made them trespassers if they had attempted to do so. A new contract to perform on different terms, the unperformed part of the old contract, which took the place of the unperformed part of the old contract, and which, under the settled law, released them from performing it, and of course from all damages, under their bond, because it was not performed. If the obligors are "allowed to escape, scot free," it is because the plaintiff in error did not choose to hold them when they could have been held. Without going into the question as to whether, if the set-off had been admitted, the money expended by the defendant below in finishing the houses would have been the proper measure of damages under the circumstances, we think that the judgment was right.

Judgment affirmed.